UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SUNSHINE HEIFERS, LLC,

           Plaintiff,

v.

           Case Number: 13-10319
           District Judge Thomas L. Ludington

MOOHAVEN DAIRY, LLC, et al.,

           Defendants.

_____/

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Sunshine Heifers, LLC ("Sunshine"), which is in the business of leasing cows, commenced this case against Defendant Moohaven Dairy, LLC ("Moohaven"), a dairy farm. Sunshine's complaint contains a number of counts; the count relevant to the matter at hand is Sunshine's count alleging that Moohaven breached a lease agreement between Sunshine and Moohaven regarding the lease of a number of dairy cows.

Sunshine filed its complaint on January 25, 2013. On December 5, 2013, Sunshine filed a motion for partial summary judgment. Sunshine has met its burden establishing that there is no genuine dispute of material fact regarding whether the parties' leasing agreement is enforceable against Moohaven. Sunshine has also established that there is no genuine dispute of material fact as to whether the leasing agreement is a true lease. Moohaven has not rebutted Sunshine's assertions. Accordingly, the Court will grant Sunshine's motion for partial summary judgment.

**I**

**A**

On October 21, 2010, Moohaven initiated a voluntary chapter 11 proceeding. Pl.'s Compl. ¶ 11, ECF No. 1. During the proceeding, Bank of America, one of Moohaven's creditors,

filed a motion to dismiss the chapter 11 proceeding, alleging that "Debtor has used (and most likely spent) approximately $225,000.00 of Bank of America's cash collateral . . . without Bank of America's consent . . . ." Creditor Bank of America's Mot. Dismiss 1, *In re Moohaven Dairy, LLC*, No. 10-24239 (Bankr. E.D. Mich. Dec. 10, 2010), ECF No. 41. After a hearing on Bank of America's motion to dismiss the case, the bankruptcy court denied the motion to dismiss but ordered the appointment of a chapter 11 trustee. Thomas McDonald was subsequently appointed as trustee on January 12, 2011. Order Directing the Appointment of a Chapter 11 Trustee, *In re Moohaven, LLC*, No. 10-24239 (Bankr. E.D. Mich. Jan. 10, 2011), ECF No. 96. Moohaven then filed a chapter 11 plan on September 30 of that year. Def.'s Resp. Ex. A, ECF No. 50.

The Trustee's First Amended Combined Plan and Disclosure Statement (First Amended Plan)—from the underlying bankruptcy—provides an extensive amount of information about the parties and the background to this litigation. Section IV of the First Amended Plan described the Moohaven Dairy operation as follows:

> The Debtor is a Michigan limited liability company that was formed on June 20, 2007. The members of the Debtor include Brent Morrell, Elwood C. Morrell, JoAnne Morrell and Leann Morrell.
>
> The Debtor owns approximately 948.23 acres in Sanilac County, Michigan. The Debtor operates a dairy farm which currently owns and leases approximately 726 cows. Constructed on the farm are several free stall barns. According to the appraisal report prepared for BOA [Bank of America], the dairy facility can handle 1,045 cattle. A sketch of the dairy facility indicating the location of the barns, lagoons and feed bunkers is attached hereto as Exhibit "1", along with a description prepared by the BOA employed appraiser of the structures. Attached as Exhibit "2" is a copy of a list of equipment prepared by the BOA appraiser.
>
> The Debtor intends to acquire approximately 200 additional head of cattle by virtue of lease agreements, similar to an arrangement that it currently maintains with Parah Leasing and approved by the Court pursuant to the order entered on September 1, 2011 [Docket No.: 267]. A copy of the Trustee's projection supporting this Plan is attached as Exhibit "3".

First Am. Plan 16–17, *In re Moohaven Dairy, LLC*, No. 10-24239 (Bankr. E.D. Mich. Sept. 30, 2011). Subsection C of Section IV of the First Amended Plan described the primary causes of Moohaven's need for bankruptcy attention:

> There were a number of factors that contributed to the bankruptcy of the Debtor. The Debtor acquired essentially a new herd of cattle, which suffered a high cull and death rate as a result of sickness, which dramatically impacted its cash flow position as a result of diminished milk production. The Debtor also, along with other dairy farms across the country, survived one of the most significant economic downturns in the milking industry when milk prices plummeted. Further contributing to this problem, was the fact that the Debtor had always contemplated that its herd size would be approximately 900 cattle and when it obtained its financing from the predecessor in interest to BOA it never was able to purchase and achieve a herd size of 900 cattle. Ultimately, all the projections that were put forward for the Debtor and the financial models put together for the Debtor failed because the Debtor did not achieve the 900 level in herd size.

*Id*. at 19–20.

In addition, the First Amended Plan explained some of the actions taken by the parties during the course of the bankruptcy proceeding:

> Since the Petition Date, and in some degree before it, the Debtor (and the Trustee post-petition) have worked to enhance the Debtor's operation and find a way to restructure the indebtedness and enable the Debtor to obtain the additional cattle that the Debtor believes is necessary to operate the farming operation at a profitable level while paying its creditors 100 cents on the dollar. This has been accomplished in large part due to the fact that the herd has stabilized through managed culling of the cattle, sale of calves and the purchase and lease of additional cattle.

*Id*. at 21.

Under the First Amended Plan, the following classes of creditors were unimpaired: Administrative Claims (Class 1); Secured Claim Kubota (Class 6); Secured Claim of PH Financial Services, Inc. (Class 7); and Secured Claim of Don Martin & Sons, Inc. (Class 8). On the other hand, the following classes of creditors were impaired under the Plan: Secured Claims of Bank of America (Class 2); Secured Claim of the IRS (Class 3); Secured Claim of the Sanilac

County Treasurer (Class 4); Secured Claim of the USDA (Claim 5); Priority Claim of the IRS (Class 9); and General Unsecured Claims (Class 10).

Pursuant to Section VII of the First Amended Plan—entitled Execution and Implementation of Plan—the parties provided that the Bankruptcy Court would retain jurisdiction to address all matters arising out of or related to the Plan. *See id*. at 33–34 ("the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to Sections 105(a) and 1142 of the Bankruptcy Code").

**B**

On January 25, 2012, Sunshine and Moohaven entered into a cow leasing agreement (the "Lease" or "leasing agreement"), which Moohaven signed but Sunshine did not sign. Pl.'s Mot. Ex. A at 4, ECF No. 47. The Lease provided that Sunshine would lease 240 cows to Moohaven for $13,056 per month for 48 months. *Id*. at 1. Moohaven could not cancel or terminate the Lease. Pl.'s Mot. Ex. A ¶ 4. Sunshine retained ownership of both the cows and any offspring of the cows. *Id*. ¶ 13. Upon expiration or default of the Lease, Moohaven agreed to return the cows to Sunshine. *Id*. ¶ 14. Moohaven agreed to maintain the herd at 240 cows at all times. Pl.'s Mot. Ex. A (Ex. B). Moohaven also guaranteed that at the end of the Lease, each cow would have a Guaranteed Residual Value of at least $240. Pl.'s Mot. Ex. A (Ex. F-1). The Lease also contained an Arizona choice of law clause. Pl.'s Mot. Ex. A ¶ 5. It also contained a merger clause making the Lease the entire agreement between Sunshine and Moohaven and prohibiting any oral modifications. *Id*. ¶ 24.

Two days later, on January 27, 2012, the bankruptcy court confirmed Moohaven's chapter 11 plan. Def.'s Resp. Ex. B.

Pursuant to the Lease, Sunshine began delivering the cows to Moohaven in February 2012. McDonald Dep. 78, *attached as* Def.'s Resp. Ex. E. Moohaven made regular payments for the next several months. Pl.'s Mot. Ex. F.

At some point after delivery of the cows, Brent Morrell, a principal of Moohaven, was seriously injured in a farm accident, and Moohaven was forced to cease operation of the dairy farm. Def.'s Resp. 2.

In November 2012, Moohaven informed Sunshine that it intended to breach the Lease. Pl.'s Compl. ¶ 24. In December, Moohaven did just that. *Id*. ¶ 25. That same month, Sunshine retrieved the cows. *Id*. ¶ 26.

## II

Federal Rule of Civil Procedure 56(a) requires the Court to grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting *Black's Law Dictionary* 881 (6th ed. 1979)). The focus of the Court's inquiry must be on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The Court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In addition, the moving party has the burden of showing the absence of a genuine dispute as to any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

But when the moving party establishes the lack of a genuine dispute as to any material fact, the burden of demonstrating the existence of such a dispute shifts to the non-moving party to come forward with "specific facts showing that there is a genuine [dispute] for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The non-moving party must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the [non-moving party].'" *Brown v. Scott*, 329 F. Supp. 2d 905, 910 (E.D. Mich. 2004) (quoting *Anderson*, 477 U.S. at 252). In order to fulfill this burden, the non-moving party need only meet the minimal standard that a reasonable jury could find in its favor. *Anderson*, 477 U.S. at 248. However, mere allegations or denials in the non-moving party's pleadings will not satisfy this burden, nor will the "mere existence of a scintilla of evidence" be sufficient. *Id.* at 248, 252.

### III

Sunshine contends that the Lease is enforceable against Moohaven, anticipating a number of Moohaven's arguments to the contrary. It argues that Moohaven, the debtor-in-possession at the time, assumed the Lease because the plan provides that "[a]ll executory contracts and unexpired leases as to which the Debtor is a party shall be deemed automatically assumed in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code . . . ." Def.'s Resp. Ex. A at 14. It also argues that the Lease did not require approval from the bankruptcy court because the bankruptcy court authorized the Lease when it confirmed the chapter 11 plan, which provides that "[t]he Debtor intends to acquire approximately 200 additional head of cattle by virtue of lease agreements . . . ." Pl.'s Mot. 11.

**A**

Section 365(a) of the Bankruptcy Code provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). However, § 365 "does not apply to postpetition contracts or leases negotiated by the debtor-in-possession on behalf of the bankruptcy estate." *In re Cannonsburg Envtl. Assocs., Ltd.*, 72 F.3d 1260, 1265 (6th Cir. 1996) (quoting *In re Revco D.S., Inc.*, 30 F.3d 134 (6th Cir. 1994) (unpublished table opinion)); *In re Dant & Russell, Inc.*, 853 F.2d 700, 706 (9th Cir. 1988). Sunshine and Moohaven entered into the lease well after Moohaven filed its chapter 11 petition, and thus, § 365 does not apply.[1]

Section 363, by contrast, does apply to postpetition transactions by the debtor-in-possession or trustee. Section 363(c)(1) provides that in a chapter 11 proceeding, "the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing." If the Lease was within the ordinary course of business, then the Lease is enforceable. Thus, the question is whether the signing of this Lease was "in the ordinary course of business."

**B**

The phrase "ordinary course of business" is not defined in the Bankruptcy Code. Courts have generally applied a two-part test in determining whether a transaction is in the ordinary course of business: the horizontal dimension test, and the vertical dimension or creditor's expectation test. *Braunstein v. McCabe*, 571 F.3d 108, 124 (1st Cir. 2009); *In re Lavigne*, 114 F.3d 379, 384 (2d Cir. 1997); *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992); *In re Merry-*

---

[1] Although the chapter 11 plan also mentions § 1123, § 1123(b)(2) states that a plan may, "subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section"; in other words, § 1123 simply refers back to § 365.

*Go-Round Enters., Inc.*, 400 F.3d 219, 226 (4th Cir. 2005); *In re Dant & Russell, Inc.*, 853 F.2d 700, 706 (9th Cir. 1988); *In re Waterfront Cos.*, 56 B.R. 31, 34-35 (Bankr. D. Minn. 1985).

The horizontal dimension test concerns "whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business." *Dant & Russell*, 853 F.2d at 704. In the vertical dimension test, the transaction is examined "from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit." *Id.* at 705 (quoting *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y.), *rev'd on other grounds*, 801 F.2d 60 (2d Cir. 1986)). In other words, the vertical dimension test examines whether a creditor would have reasonably expected the debtor to enter into such a transaction. *Collier on Bankruptcy* ¶ 363.03[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

Dairy farms like Moohaven, which is in the business of caring for milk-producing cows, would likely lease cows in order to produce milk rather than owning the cows outright. Similarly, creditors would expect a dairy farm like Moohaven to enter into cow leases in order to produce milk. Indeed, Mr. McDonald, Moohaven's chapter 11 trustee, testified that he believed when he negotiated the Lease that entering into a dairy cow lease was in the ordinary course of business for Moohaven. McDonald Dep. 44.

Moohaven argues that court approval was necessary because the Lease was not an unsecured transaction, as the Lease provided for a milk check assignment as security. Def.'s Resp. 13. Section 364 provides, in pertinent part:

> (a) If the trustee is authorized to operate the business of the debtor under section 721, 1108, 1203, 1204, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

> . . .
>
> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
> > (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> > (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> > (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364 (a), (c).

Moohaven does not explain how § 364 applies here. The milk check assignment attaches to an income stream—the proceeds from selling the cows' milk—but not the underlying asset—the cows themselves—and it is the cows that Sunshine leased to Moohaven, not the milk from those cows. Nor does Moohaven explain how the cows could be considered "credit" for purposes of § 364.[2] While the bankruptcy court did not specifically approve the Lease at hand, it did confirm the chapter 11 plan, which in particular contemplated a new cow lease: "The Debtor intends to acquire approximately 200 additional head of cattle by virtue of lease agreements . . . . The financial projections assume that the Debtor will obtain approximately 200 cows." Def.'s Resp. Ex. A at 17, 29.

Moreover, Moohaven is estopped from claiming that it did not have authority to enter into the Lease. "Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *Fid. & Deposit Co. of Md. v. Bondwriter Sw., Inc.*, 263 P.3d 633, 639 (Ariz. Ct. App. 2011) (quoting Restatement (Third) of Agency § 4.01(1) (2006)). It is undisputed that Moohaven took delivery of the cows, made lease payments, and sold their milk until Sunshine retrieved those cows. McDonald Dep. 62, 88; Pl.'s

---

[2] Even if the cows could be considered credit, it is very likely that *nunc pro tunc* approval would have been granted: the Lease almost certainly would have been authorized had timely application been made, it is unlikely any creditor would have been harmed by the continuation of the business, and both Sunshine and Moohaven honestly believed they had authority to enter into the transaction. *See In re Am. Cooler Co.*, 125 F.2d 496, 497 (2d Cir. 1942).

Mot. Ex. F. Mr. McDonald also admitted that he authorized Mr. Morrell to sign the Lease and fully intended for Moohaven to be bound by the Lease. McDonald Dep. 59–60. Based on these facts, insofar as the Lease was not already authorized by the chapter 11 plan, Moohaven ratified the Lease through its post-confirmation actions.

In sum, the Lease between Sunshine and Moohaven is enforceable against Moohaven.

## IV

Having found that the Lease is enforceable against Moohaven, attention is now given to whether the leasing agreement is a true lease or a disguised security agreement.

## A

The Lease contains an Arizona choice of law clause, Pl.'s Mot. Ex. A ¶ 5, and Moohaven accepts that Arizona law is the applicable law.

Section 47-1203 of the Arizona Revised Statutes, equivalent to Uniform Commercial Code § 1-203, provides the relevant law governing true leases versus security agreements. Section 47-1203(B) provides that a "transaction in the form of a lease creates a security interest" if the lease "is not subject to termination by the lessee," and any one of the following applies:

1. The original term of the lease is equal to or greater than the remaining economic life of the goods;

2. The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

3. The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration on compliance with the lease agreement; or

4. The lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration on compliance with the lease agreement.

Ariz. Rev. Stat. § 47-1203(B)(1)-(4).

The burden of recharacterizing the Lease as a security agreement rests on Moohaven, the party that seeks to recharacterize the Lease. *See In re Pillowtex, Inc.*, 349 F.3d 711, 716 n.6 (3d Cir. 2003); *In re Owen*, 221 B.R. 56, 60 (Bankr. N.D.N.Y. 1998).

The threshold condition is met here because the Lease is not subject to termination by Moohaven. *See* Pl.'s Mot. Ex. A ¶ 4. Thus, the Court turns to whether any of the four conditions apply.

**B**

If the original term of the lease is equal to or greater than the remaining economic life of the goods, then the lease is actually a disguised security agreement. Ariz. Rev. Stat. § 47-1203(B)(1).

Moohaven has essentially acknowledged that the remaining economic life of the cows is greater than the term of the Lease. In its response to Sunshine's Interrogatory 24, Moohaven stated that at the end of the 48-month Lease, the expected value of the cows was $900 to $1400 per cow. Pl.'s Mot. Ex. G ¶ 24.

Ordinarily, a party is not bound to its responses to interrogatories and may amend its responses. Fed. R. Civ. P. 33 advisory committee notes, 1970 amend., subdiv. (b); *see*, *e.g.*, *TexPar Energy, Inc. v. Murphy Oil USA, Inc.*, 45 F.3d 1111, 1115 (7th Cir. 1995); *McElroy v. United Air Lines, Inc.*, 21 F.R.D. 100, 101 (W.D. Mo. 1967). In fact, a party must "supplement or correct its disclosure or response" in a timely manner if it learns that its response is incomplete or incorrect. Fed. R. Civ. P. 26(e)(1). However, "reliance on an answer may cause such prejudice that the court will hold the answering party bound to his answer." Fed. R. Civ. P. 33 advisory committee notes, 1970 amend., subdiv. (b).

Here, Moohaven argues that Mr. McDonald, Moohaven's trustee, misunderstood the interrogatory. But Moohaven did not raise Mr. McDonald's mistaken response until after Sunshine had relied on this statement in its brief in support of its motion for partial summary judgment. Moohaven also has not attempted to amend its response to Interrogatory 24. Allowing Moohaven to amend or withdraw its response at this stage would be prejudicial to Sunshine because Mr. McDonald's statement alone is sufficient to find that the remaining economic life of the cows is greater than the term of the lease.[3] Thus, for purposes of this partial summary judgment motion, Moohaven may not amend its answer and is estopped from claiming that the expected market value of the cows at the end of the lease should be something other than $900 to $1400 per cow.

Even if Moohaven were not held to its answer to Interrogatory 24, it is clear that the economic life of the cows exceeds the term of the Lease. The Lease requires Moohaven to "maintain the number of Cows . . . at all times." Pl.'s Mot. Ex. A at Ex. B. Given that the herd will always remain at a minimum of 240 cows (notwithstanding offspring), it is clear that the economic life of the cows will exceed the 48-month term of the Lease.

In addition, although Moohaven argues that the Lease does not expressly include offspring—emphasizing that "Cows" refers to "the number of cows shown above," or "240 Head Holstein Heifers"—it is clear from reading the Lease as a whole that it does include offspring. *See* Pl.'s Mot. Ex. A ¶ 1. Paragraph 13 of the Lease, titled "Ownership," states that "[a]ll right, title and interest in the Cows shall remain in Sunshine during the term of this Lease and shall

---

[3] In addition, holding Moohaven to its answer to Interrogatory 24 is consistent with Federal Rule of Civil Procedure 36(b), which states that an admission may be withdrawn on motion if the court is not persuaded that it would prejudice the requesting party. *Cf. United States v. An Article of Drug Consisting of 30 Individually Cartoned Jars, More or Less, of an Article Labeled in Part: "Ahead Hair Restorer for New Hair Growth,"* 43 F.R.D. 181, 188 (D. Del. 1967) (interrogatories under Rule 33 may be used to obtain admissions).

include all offspring born to leased Cows during the leased term." These offspring plainly have an economic life that will exceed the term of the Lease.

Furthermore, the Lease contains a "residual guarantee," which provides that the herd would have a minimum Guaranteed Residual Value of $240 per cow, or $57,600. Sunshine originally paid $360,000 for the cows, or $1500 per cow. Def.'s Resp. Ex. F ¶ 12. The Guaranteed Residual Value represents 16 percent of the original purchase price. Although a significant decrease, it is hardly a nominal amount of money.

Moohaven argues that the original term of the Lease is equal to or greater than the remaining economic life of the cows Sunshine delivered, and therefore constitutes a "security arrangement," relying on *In re Purdy*, 490 B.R. 530 (Bankr. W.D. Ky. 2013). *See* Def.'s Resp. 8, 11. Moohaven indicates that because the leases in *Purdy* contained "nearly [the] exact provisions" contained in the Lease here, and were security agreements, the Lease is a security agreement as well.

But the Court finds *Purdy* both unpersuasive and distinguishable. The court in *Purdy* discussed whether the term of the lease exceeded the economic life of the goods only in cursory fashion, stating that "[u]ncontradicted testimony indicated that a dairy herd is culled annually at an approximate rate of 30 percent. Within three years an entire herd is extremely likely to have been entirely replaced and certainly before the end of 50 months." *Id.* at 536. The court in *Purdy* assumed an arithmetic decrease in the composition of the herd. In other words, the court assumed that each year, 30 percent of the *original* herd would be culled. Thus, after the first year, only 70 percent would remain. After the second year, only 40 percent would remain. And so on. Thus, the court concluded that over 48 months, the entire herd would be culled.

-13-

However, the average lifespan of a dairy cow is approximately five years.[4] U.S. Envtl. Prot. Agency, *Ag 101 Dairy Production Lifecycle Production Phases*, http://www.epa.gov/oecaagct/ag101/dairyphases.html (last visited Apr. 8, 2014). In addition, data from ten states in the eastern United States show approximately four years after a cow begins producing milk, 42.9 percent of cows will have been culled, meaning that 57.1 percent of cows will continue to produce milk.[5] G.L. Hadley et al., *Dairy Cattle Culling Patterns, Explanations, and Implications*, 89 J. Dairy Sci. 2286, 2292 tbl. 5 (2006). Accordingly, on average, over a four year period more than 50 percent of a dairy herd will likely survive. *See id.* The *Purdy* court's use of an arithmetic decrease goes against this evidence, and is therefore unpersuasive.

Because it is apparent that a significant number of cows do survive beyond 48 or 50 months, the *Purdy* court would have been better served employing a geometric progression rather than an arithmetic progression to calculate the economic life of the cows Sunshine leased to Moohaven. That is, an exponential decrease rather than a linear decrease. For example, Moohaven stated that its cull rate for the herd leased from Sunshine was at least 32.6 percent. Def.'s Resp. 5–6. Based on a cull rate of 32.6 percent per year, after the first year, 67.4 percent of the original herd would remain. During the second year, Moohaven would cull 32.6 percent of this *remaining* 67.4 percent from the original herd. Thus, at the end of the second year, 45.4 percent of the original herd would remain (rather than 34.8 percent under the arithmetic progression). After the third year, another 32.6 percent would have been culled from the remaining 45.4 percent of the original herd. So at the end of 36 months, 30.6 percent of the original herd would remain. Finally, at the end of 48 months, pursuant to this calculus,

---

[4] Cows usually begin calving at around 24 months of age. *Id.*

[5] These data exclude cows culled for dairy, that is, cows that were sold to another dairy farm.

approximately 20.6 percent of the original herd would remain.[6] Although a substantial proportion of the herd would have been culled by the end of 48 months, this demonstrates that the term of the Lease does not exceed the economic life of the goods.

In addition, a number of facts in this case differ from *Purdy*. The court in *Purdy* noted that Sunshine, the creditor, could not show any credible evidence of its ownership of the herd that was leased. 490 B.R. at 536–37. Furthermore, in *Purdy*, Sunshine provided funds to reimburse the debtor for purchasing replacement cows. *Id.* at 537. Sunshine also did not own the offspring of the cows, as that clause had been eliminated by the debtor. *Id.* The *Purdy* court noted that these additional facts further established that the transaction between Sunshine and the debtor was a disguised security transaction. *Id.* at 538.

Here, Sunshine purchased the cows before leasing them to Moohaven, in contrast to *Purdy*, where it had leased the cows and then re-leased them to the debtor. *See id.* at 536–37; Def.'s Resp. Ex. F ¶ 11; *see also id.* ¶¶ 10, 12. In addition, there is no evidence that Sunshine reimbursed any of Moohaven's expenses. Finally, unlike the leases in *Purdy*, the Lease here maintained the clause keeping ownership of offspring with Sunshine rather than Moohaven. *See* Pl.'s Mot. Ex. A ¶ 13.

In sum, Moohaven's admission and the terms of the Lease show that the term of the Lease does not exceed the remaining economic life of the cows, and on this factor, the Lease is not a disguised security agreement.

---

[6] It is unlikely that the cull rate, for a given population, would be so high throughout a time period because any cows remaining after the initial culls would be more likely to be the herd's most healthy and productive cows, and the data from the ten states in the eastern United States suggest that the rate of change in the cull rate over ten years decreases over time.

**C**

If the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods, then the lease is actually a disguised security agreement. Ariz. Rev. Stat. § 47-1203(B)(2).

Here, although Moohaven alleges that it was "essentially bound to become the owner" of the cows because it would have made economic sense to do so, assuming arguendo that it could purchase the cows by paying $240 per head, there is no language in the Lease suggesting that Moohaven was *required* by the terms of the agreement to renew the lease. *See* Def.'s Resp. 10. Thus, on this factor the Lease is not a disguised security agreement.

**D**

If the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration, then the lease is actually a disguised security agreement. Ariz. Rev. Stat. § 47-1203(B)(3). Moohaven has acknowledged that it does not have an option to renew, Def.'s Resp. 10, and the Court need not consider this issue further.

**E**

If the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration, then the lease is actually a disguised security agreement. Ariz. Rev. Stat. § 47-1203(B)(4).

In Arizona, the parol evidence rule precludes admission of extrinsic evidence that varies or contradicts the meaning of the written words of the contract.[7] *Taylor v. State Farm Mut. Auto.*

---

[7] Legal commentators have drawn a distinction between the application of the parol evidence rule with regard to evidence that adds to or modifies the terms of a contract, versus evidence used to interpret the existing terms of a contract. If a contract is integrated, then no extrinsic evidence may be admitted to contradict or even supplement the terms of the contract. If the contract is partially integrated, then extrinsic evidence may be introduced only to

-16-

*Ins. Co.*, 854 P.2d 1134, 1139 (Ariz. 1993). In contrast, if the language of the contract is reasonably susceptible to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties. *Id.* at 1140 (citing with approval *Pac. Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.*, 442 P.2d 641 (Cal. 1968)). However, if the evidence offered does not aid in interpretation because "the asserted meaning of the contract language is so unreasonable or extraordinary that it is improbable that the parties actually subscribed to the interpretation asserted by the proponent of the extrinsic evidence," then the Court may decide not even to consider the evidence. *Id.* at 1139. "At what point a judge stops 'listening to testimony that white is black and that a dollar is fifty cents is a matter for sound judicial discretion and common sense.'" *Id.* (quoting 3 Arthur L. Corbin, Corbin on Contracts § 579 (1992 Supp.)).

Sunshine argues that the "residual guarantee" of the Lease does not contain an option to purchase. Pl.'s Mot. 9–11. Moohaven confusingly argues that it "did not have a right under the Agreement to renew the Agreement," seemingly conceding the issue, but also arguing that it "was essentially bound to become the owner." Def.'s Resp. 10. In particular, Moohaven argues that there was an "expectation," based on telephone conversations with Sunshine, that at the end of term, if Moohaven paid the residual guarantee of $240 per cow, Moohaven would become the owner of those cows. McDonald Dep. 25–26, 71; McDonald Aff. ¶ 9, *attached as* Def.'s Reply Ex. I.

The residual guarantee of the Lease provides that

---

supplement the terms of the contract. In contrast, extrinsic evidence may always be introduced to interpret the terms of a contract; it is only when extrinsic evidence goes beyond interpreting a term into contradicting a term that the parol evidence rule applies to exclude that evidence. *See* 5 Corbin on Contracts § 24.7 (Joseph M. Perillo ed., rev. ed. 2013).

1. Lessee guarantees to Lessor that the net sales proceeds from the sale of the Cows . . . at the end of the Lease term shall be $240.00 per head (the "Guaranteed Residual Value").

2. Lessee understands that Sunshine shall use its[] best efforts to sell the Cows within sixty (60) days of the termination of the Lease. The sale may be on any terms so long as Sunshine acts in good faith . . . . If the net sales proceeds received by Sunshine are less than the Guaranteed Residual Value described above, Lessee agrees to pay Sunshine . . . the difference . . . .

Pl.'s Mot. Ex. A (Ex. F-1).

Moohaven is essentially requesting that the Court admit extrinsic evidence either to interpret the residual guarantee, or relatedly to modify the residual guarantee. But after reviewing the residual guarantee, the language is not reasonably susceptible to an interpretation that Moohaven would able to purchase the cows if it paid the residual guarantee of $240 per head. The fact that "Sunshine shall use its[] best efforts to sell the Cows," and the fact that "[i]f the net sales proceeds . . . are less than [$240.00], Lessee agrees to pay Sunshine . . . the difference," demonstrates that Moohaven did not have an option to purchase the cows. For if it did, these two clauses would be surplusage—there would be no need for Sunshine to use its best efforts to sell the cows if Moohaven could simply pay $240 a head. Moreover, there would be no need for Moohaven to pay the difference between the Guaranteed Residual Value and the sale price because the sale price would be fixed from the beginning at $240 per head.

Insofar as Moohaven is arguing that any oral discussion with Sunshine modifies the written residual guarantee, as opposed to the argument that the residual guarantee itself gives Moohaven the option to purchase the cows, the leasing agreement's merger clause operates to fully integrate the agreement. *See* Pl.'s Mot. Ex. A ¶ 24. Further, the parol evidence rule bars the introduction of such evidence to modify the contract because such evidence would act to vary or contradict the meaning of the contract. *See Taylor*, 854 P.2d at 1139.

Finally, Moohaven's statute of frauds argument does not render the contract voidable on this question. The contract "must be signed by the party against whom it is sought to be enforced, but not by the party who seeks to enforce it." *Nationwide Res. Corp. v. Massabni*, 658 P.2d 210, 215 (Ariz. Ct. App. 1982); *see* Ariz. Rev. Stat. § 44-101. Although Sunshine did not sign the Lease, Sunshine is seeking enforcement of the Lease against Moohaven, which did sign the agreement, and thus, the statute of frauds is inapplicable.[8]

Consequently, the residual guarantee does not contain an option for Moohaven to purchase the cows, and on this factor, the Lease is not a disguised security agreement.

As a result, based on a review of all four factors, the Lease is not a disguised security agreement but is instead a true lease.

V

Viewing the evidence in the light most favorable to Moohaven, Moohaven has not rebutted Sunshine's showing that there is no genuine dispute of material fact as to whether the Lease is enforceable against Moohaven. In addition, the Lease entered into between Sunshine and Moohaven is a true lease. Sunshine is entitled to judgment as a matter of law on these two issues.

Accordingly, it is **ORDERED** that Plaintiff's motion for partial summary judgment, ECF No. 47, is **GRANTED**.


Dated: April 16, 2014                                    s/Thomas L. Ludington
                                                         THOMAS L. LUDINGTON
                                                         United States District Judge

---

[8] In any event, even though the contract exceeds one year, when a party has fully performed a contract, as Sunshine has, the statute of frauds is inapplicable as to that party. *See Trollope v. Koerner*, 470 P.2d 91, 98 (Ariz. 1970).

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 16, 2014.

s/Tracy A. Jacobs<br>TRACY A. JACOBS